IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

GLORIA JANE MILLER,         *

     Plaintiff,          *

vs.                   *

                                CASE NO. 3:14-cv-45(CDL)

ADVANTAGE BEHAVIORAL HEALTH  *
SYSTEMS,

                        *

     Defendant.

---

O R D E R

     Plaintiff Jane Miller is a former employee of Defendant Advantage Behavioral Health Systems. Miller contends that Advantage discharged her because of her age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA). Advantage filed a motion for summary judgment arguing that it terminated Miller for legitimate reasons. Because there are genuine fact disputes regarding the reason for Miller's termination, the motion for summary judgment (ECF No. 14) is denied.

SUMMARY JUDGMENT STANDARD

     Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). In determining whether a *genuine* dispute of *material* fact exists, the Court must accept the non-movant's

evidence as true and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict in favor of the non-movant. *Id.*

FACTUAL BACKGROUND

The record viewed in the light most favorable to Miller, the non-movant, reveals the following:

## I. Miller's Employment with Advantage

Advantage is a Community Service Board that receives funding from the state to provide mental health, substance abuse, and developmental disability services at clinics throughout Georgia. Miller's most recent employment with Advantage began as a part-time nurse in 2002.[1] Shortly thereafter, Miller became the Crisis Stabilization Unit manager and a full-time employee. In August of 2006, Miller took a voluntary demotion and pay decrease to a staff nurse position at Advantage's clinic in Clarke County because she did not like the

---

[1] Miller was briefly employed with Advantage in 1998 and 1999. In 1999, her son was in a car accident and Miller was terminated for abandoning her position when she did not come in to work. This prior employment is not material to the present motion. *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997)(per curiam) (noting that a fact is material when "it has the potential to change the outcome of the lawsuit").

way the Crisis Unit was operated.  Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 4, Pl.'s Decl. ¶ 3, ECF No. 17-6.

### A.  Miller's Tenure at the Clarke Clinic

The series of events leading to Miller's termination began in 2006, when she was working at the Clarke clinic.

#### 1.  Miller's Work Performance at the Clarke Clinic

Advantage asserts that Miller was behind on paperwork at the Clarke clinic.  Miller explains, however, that when she arrived at Clarke, she received a room of overdue paperwork that became her responsibility.  Pl.'s Decl. ¶ 5.  It is undisputed that the timely filing of paperwork like Multi-Information Consumer Profiles and billing forms is crucial to Advantage's consistent receipt of state funds. Miller testified that she was never personally behind on paperwork at Clarke and that any backlog in paperwork preceded her employment there.  Pl.'s Dep. 171:4-9, ECF No. 26; Pl.'s Decl. ¶ 5.

Although Miller asserts that the backlog was not her fault, she was issued corrective action plan letters in April, May, and July of 2008.  Corrective action plans were automatically generated on a monthly basis for all clinicians who were not meeting 100% productivity.  Eckhardt Dep. 122:23-123:12, ECF No. 27.  Miller claims, however, that productivity was based, at least somewhat, on how many patients she saw.  Pl.'s Dep. 261:18-265:2.  Miller received the corrective action plans

because she was not able to see enough patients to meet the productivity requirement while she caught up on the paperwork left by her predecessor. *Id*. Miller clarifies, however, that she did not have any problem meeting the productivity requirement at Clarke when she was not catching up on paperwork. *Id*. at 265:18-24.

### 2. Eckhardt's Age-Related Comments to Miller

During Miller's employment at the Clarke clinic, Fred Eckhardt, the chief operations officer of Advantage who ultimately fired Miller, began making age-related comments to her.[2]   *Id*. at 199:12-22.  Miller testified that Eckhardt told her she should think about retiring and that "as you get older you move slower."  *Id*. at 199:17-200:9. Eckhardt also said he thought it was better to have younger nurses because "as you g[et] older, you couldn't teach a dog new tricks."  *Id*. at 206:6-9.  Additionally, he told Miller that "you older nurses that work here make too much money" because he could "hire two nurses for what [Miller] ma[de]."[3]  *Id*. at 209:12-16.

---

[2] Advantage cannot seriously dispute that Eckhardt was primarily responsible for the decision to terminate Miller, although three other officers concurred in the decision. Eckhardt Dep. 74:6-77:9.  Thus, evidence of Eckhardt's age animus may be used against Advantage. *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 151 (2000) (holding the employer responsible for the primary decisionmaker's ageist comments).

[3] Eckhardt denies making age-related comments to Miller, but at the summary judgment stage Miller's testimony must be taken as true. *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1361 (11th Cir.

B.   Miller's Tenure at the Elberton Clinic

Eckhardt suggested that Miller transfer to Advantage's Elberton clinic in 2008. *Id.* at 192:18-193:3. Eckhardt told Miller she was getting "sore (sic) because of [her] age" and needed to go to Elberton because "it was a little bit quieter there." *Id.* Miller agreed to move to Elberton because she was "tired of [Eckhardt] making comments about [her] age." *Id.* at 196:1-6.

Although it is somewhat unclear from Miller's testimony exactly when every age-related comment occurred, it is clear that, according to Miller, Eckhardt made comments repeatedly in the years preceding her termination. *Id.* at 198:25-210:15. The comments were pervasive enough that Miller spoke to Terry Frazier, the human resources director, about them. *Id.* at 215:9-20. Frazier told her, however, that a complaint against Eckhardt would do no good. *Id.* Miller knew that other employees had complained to human resources and received the same response so she was discouraged from filing a formal complaint. *Id.* at 217:4-218:20.

Regarding Miller's performance at the Elberton clinic, although Eckhardt testified that she was an underperformer at Elberton, Eckhardt Dep. 77:3-79:24, Miller stated that she

1999) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)) ("In the summary judgment context. . . 'the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.'").

received bonus checks for productivity approximately every three months. *Id.* at 191:3-8.

C.   Miller's Tenure at the Jackson Clinic

Eckhardt transferred Miller to Advantage's Jackson clinic on October 31, 2008.  Pl.'s Decl. ¶ 11 & Attachment A, ¶ IV. Rae Meeks, a support staff supervisor at Jackson, stated that she did not know why Miller, who lived far away, was moved to Jackson when there were other nurses who lived closer.  Pl.'s Resp. Ex. 17, Meeks Decl. II ¶ 3, June 24, 2015, ECF No. 17-19. Miller says that Eckhardt expressed concern about her keeping up with paperwork at Jackson because of her age, but moved her there and "gave her" a chance.  Pl.'s Dep. 347:2-16.

Historically, the Jackson clinic had only one nurse who saw a large number of patients.  Pl.'s Decl. ¶ 7.  Eckhardt knew that Miller's predecessor nurse at Jackson was buried in a backlog of paperwork shortly before she left.  Pl.'s Resp. Ex. 6, Email from Shannon Sallee to Fred Eckhardt (Jan. 9, 2008), ECF No. 17-8 ("Shannon Sallee Email").  Addtionally, Eckhardt began requiring Miller to see nonemergency walk-in patients shortly after she was transferred to Jackson.  Pl.'s Decl. ¶ 8. Nurses at other clinics were only required to see *emergency* walk-in patients.  *Id.*; Meeks Decl. II ¶ 4.

According to Miller, Eckhardt and Robin Bromley, the lead therapist at the Jackson clinic, decided to watch Miller closely

and record every error to create a record for her termination.
*See* Pl.'s Resp. Ex. 18, Email from Robin Bromley to Fred
Eckhardt (July 2, 2009), ECF No. 17-20 ("'This Helps' Email").
Rae Meeks, who worked as a staff supervisor at the Jackson
clinic until June of 2009, stated that Bromley was "always
making life difficult" for Miller. Meeks Decl. II ¶ 2, 5.
Bromley emailed Eckhardt with complaints about Miller in May,
June, July, and August of 2009. Def.'s Mot. for Summ. J. Ex.
22, Email from Robin Bromley to Fred Eckhardt (May 19, 2009),
EFC No. 14-23, Ex. 23, Email from Robin Bromley to Fred Eckhardt
(June 22, 2009), ECF No. 14-24, Ex. 24, Email from Robin Bromley
to Fred Eckhardt (Aug. 3, 2009), ECF No. 14-25, & Ex. 25, Email
from Robin Bromley to Fred Eckhardt (July 6, 2009), ECF No. 14-
26.[4]

---

[4] Miller objected to these four emails as well as twenty-nine other
exhibits attached to Advantage's motion for summary judgment, arguing
they are unauthenticated, inadmissible hearsay. Advantage has since
filed the declaration of Theresa Davis, Advantage's director of human
resources, authenticating these documents. Def.'s Reply, Ex. 1, Davis
Decl. ¶ 2-4, ECF No. 19-1. Additionally, Defendant's exhibits 1-7,
11, 17-19, 27, and 30 likely constitute business records under Fed. R.
Evid. 803(6) and are, therefore, admissible. The remaining exhibits
are emails that Advantage argues were kept in the regular course of
business. This assertion alone, however, may be insufficient to admit
the emails as business records. *See United States v. Cone*, 714 F.3d
197, 219-20 (4th Cir. 2013) (holding that merely stating that the
emails were kept in the regular course of business is an insufficient
foundation to admit them under the business records exception to
hearsay). Nevertheless, it is highly likely that Advantage will be
able to lay the foundation to admit the emails at trial because the
emails are written by supervising employees discussing business
matters. Thus, the Court may consider the emails in determining this
motion. *Macuba v. Deboer*, 193 F.3d 1316, 1322-24 (11th Cir. 1999)
(internal quotations omitted) ("[A] district court may consider a

Although Advantage contends that Miller's performance was consistently substandard at Jackson, Miller points to evidence that arguably conflicts with this contention. She received incentive pay for productivity in February and May of 2009. Pl.'s Resp. Ex. 14, Personnel Action Requests, ECF No. 17-16. Additionally, Meeks stated that when she left Jackson in June of 2009, Miller was completely up to date on her paperwork. Meeks Decl. II ¶ 2. Meeks also noted that, while she was at Advantage, Miller did not make any more errors with paperwork than Bromley did. Pl.'s Resp. Ex. 5, Meeks Aff. I ¶ 2, Sept. 15, 2011, ECF No. 17-7. Bromley also recalls that billing errors were not uncommon at Advantage. Pl.'s Resp. Ex. 15, Bromley Decl. ¶ 3, ECF No. 17-17.

In June of 2009, Advantage switched from a paper-based billing system to a computer-based system called CareLogic. With this switch, Advantage changed its filing policy so that all clinicians were required to personally file their Profile and billing updates. Pl.'s Decl. ¶ 9. Following the change, support staff, like Rae Meeks, left Jackson and Miller became solely responsible for all of her own paperwork. *Id.*; Meeks Decl. II ¶ 2. Due to this switch, Miller fell behind because

---

hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial. . . .").

she was the only nurse at Jackson and consistently saw more than a full day of patients.  Pl.'s Decl. ¶ 9.

Miller stayed late every day and usually came in on Fridays, her day off, to try and keep up under the new system. Pl.'s Dep. 301:15-25.  Nevertheless, Eckhardt issued Miller a "letter of concern" in August of 2009 regarding her paperwork deficiencies.

Miller communicated with Advantage about the overload of paperwork and asked for assistance.  Pl.'s Dep. 308:19-309:17. Despite Advantage's contention that it made adjustments to help Miller, Miller asserts that most of these alleged adjustments were discussed but never effectively put into practice.   For example, in August of 2009, Miller asked that her last appointment be at 5 pm so that she would have time at the end of the day to catch up on her paperwork.  Miller states, however, that this did not effectively occur.  Pl.'s Dep. 297:20-301:13.

Additionally, around November of 2009, a paperwork compliance expert, Matt Hurd, met with Miller.  Hurd suggested schedule changes to allow Miller time to do paperwork between clients.  Subsequently, Miller was issued a follow-up "letter of concern" informing her of Hurd's recommended changes.  Although Keo Copeland, the Jackson office manager, made an effort to implement the recommended schedule changes, Miller never actually experienced the breaks due to double booking and walk-

ins. Pl.'s Dep. 324:10-325:8.  Finally, a temporary nurse was supposed to come in for several weeks to help Miller with the backlog.  The temporary nurse, however, hurt her ankle and was only able to work four or five days.  Pl.'s Dep. 328:21-329:23.

Miller received another follow-up "letter of concern" on December 3, 2009.  Pl.'s Dep. Ex. 15, Letter from Fred Eckhardt to Jane Miller (Dec. 3, 2009), ECF No. 26-15.  At that time, Miller had 290 client Profiles to complete within the month. Pl.'s Dep. 325:14-17. Miller decreased that number to 142 by December 21, 2009.  Pl.'s Dep. 332:5-9.  Then, by December 31, 2009, Miller's paperwork was up to date.  Pl.'s Decl. ¶ 10. Miller accomplished this by working extra hours over the Christmas holidays, including Christmas Eve.  *Id.*

On January 12, 2010, Miller called Eckhardt to tell him that she would be out of work sick with strep throat.  Eckhardt informed Miller that she was being terminated.  Pl.'s Dep. 334:5-17.  On January 16, 2010, Miller went to Eckhardt's office and received her official letter of termination.  At this meeting, Miller reiterated to Eckhardt that he had treated her unfairly by making age-related comments, moving her from clinic to clinic, and placing her in an impossible position.  Pl.'s Dep. 338:23-339:16.  Advantage hired a twenty-five year-old nurse to replace Miller.  Copeland Dep. 41:6-7, ECF No. 28;

Pl.'s Resp. Ex. 11, Def.'s Resp. to Pl.'s Interrogs. ¶ 4, ECF No. 17-13.

After exhausting administrative remedies with the EEOC, Miller filed this age discrimination action claiming that Advantage discharged her because of her age in violation of the ADEA.[5]

## II. Pat Gibby's Experience with Eckhardt

Miller's testimony regarding Eckhardt's age-related comments is substantiated by Pat Gibby. Gibby, another former Advantage nurse, allegedly had a similar experience with Eckhardt. Pl.'s Resp. Ex. 12, Gibby Aff. I ¶ 3, Jan. 12, 2012, ECF No. 17-14. According to Gibby, prior to her retirement, Eckhardt told her that it was "time for [her] to go." *Id*. When she refused to resign, Advantage unjustifiably wrote her up for violations, including infractions which Gibby claims she never committed. *Id*. Miller offers two other incidents involving Gibby in 2010 that both Gibby and Miller contend show bias and discriminatory treatment. *Id*. ¶ 4. First, Gibby was told that she would have to work the night shift instead of the day shift. *Id*. Second, she was told she had to work during a planned holiday. *Id*. Gibby viewed both incidents as attempts to get

---

[5] Miller originally brought a hostile work environment claim as well. She did not respond to Advantage's summary judgment motion on this claim so the Court finds that she has abandoned it. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

rid of her; she gave in and retired. *Id.*  Gibby is also Miller's friend and first cousin.

DISCUSSION

To prove age discrimination under the ADEA, Miller must establish that age was the "but for" cause of her termination. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).  An illegal age discrimination claim may be established "through either direct. . . or circumstantial evidence." *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (per curiam)(quoting *Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008)).  Miller asserts that she has offered both direct and circumstantial evidence of intentional age discrimination.

## I.  Eckhardt's Age-Related Comments

For purposes of the Court's summary judgment analysis, Eckhardt's age-related comments may not constitute "direct evidence."  The Eleventh Circuit has developed a "rigorous standard" for when such evidence constitutes direct evidence of discrimination.  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999).  Direct evidence must "correlate[e] to the discrimination. . . complained of by the employee."  *Id.* at 1358 (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998)).  Here, Eckhardt's age-related comments occurred during the four

years preceding Miller's termination.  Although the comments clearly show Eckhardt's age animus, Eckhardt never indicated an intent to *terminate* Miller because of her age. *Cf. id.* at 1359 (giving "Fire Earley-he is too old" as an example of direct evidence of age discrimination)(quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990))).  To find age discrimination, the factfinder must infer a connection between Eckhardt's ageist comments and his subsequent termination decision.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) ("Direct evidence is evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." (alteration in original) (quoting *Burrell v. Bd. Of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997))).[6]  Thus, rather than relying on Eckhardt's comments as direct evidence of discrimination, the Court will consider the comments as circumstantial evidence of discrimination for the purposes of summary judgment.

---

[6] Judge Tjoflat has expressed reservations about this "without inference" definition of direct evidence, noting that the Eleventh Circuit has previously found direct evidence where the evidence required an inference. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1295-99 (11th Cir. 1999)(plurality opinion).  But the Eleventh Circuit continues to use the "without inference" definition. *See, e.g., Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 854 (11th Cir. 2010); *Scott v. Suncast Beverages Sales, Ltd.*, 295 F.3d 1223, 1227-28 (11th Cir. 2002).  Here, the inference required to find discrimination from Eckhardt's comments is not entirely clear because Miller's deposition is not definitive regarding when every age related comment occurred.  Nevertheless, whether or not the age-related comments constitute direct evidence does not matter for this motion.  As discussed below, even if Eckhardt's comments are only circumstantial evidence, summary judgment is not appropriate.

## II.  McDonnell Douglas Framework

For claims based upon circumstantial evidence, the Court uses the analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Kragor v. Takeda Pharm. Am. Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).[7] Under *McDonnell Douglas*, Miller must first establish a prima facie case of discrimination. *Id.* This requires showing (1) that she was a member of the protected age group; (2) that she was subject to an adverse employment action; (3) that a substantially younger person filled her position; and (4) that she was qualified to do the job from which she was discharged. *Id.*

After Miller establishes a prima facie case, the burden of production shifts to Advantage. *Id.* To rebut the presumption of discrimination established by the prima facie case, Advantage must articulate a legitimate, nondiscriminatory reason for Miller's termination. *Id.* If Advantage does so, Miller, in order to survive summary judgment, must present evidence from which a reasonable juror could conclude that Advantage's reason is pretext for discrimination. *Id.* at 1308-09.

---

[7] In *Gross*, the Supreme Court reserved the issue of whether or not *McDonnell Douglas* applies to circumstantial evidence cases under the ADEA. 557 U.S. at 174-75 & n.2. The Eleventh Circuit continues to apply *McDonnell Douglas* in the ADEA context. *Kragor*, 702 F.3d at 1308. The Court expressly addressed *Gross* and determined that continued application of *McDonnell Douglas* in ADEA cases is consistent with the Supreme Court's opinion. *Sims v. MCM, Inc.*, 704 F.3d 1327, 1332-34 (11th Cir. 2013).

### III. Miller's Prima Facie Case

Miller has clearly established a prima facie case of age discrimination. Miller, who was sixty-one years old when terminated, was a member of the protected age group; she was replaced by a substantially younger twenty-five year-old employee; and her termination constitutes an adverse employment action.  The Court further finds that for purposes of a prima facie case, Miller was qualified for her position based in part on her eight years of employment with Advantage.  *Damon*, 196 F.3d at 1360 (reversing the district court's determination that the plaintiff was not qualified because qualification is inferred when a plaintiff is discharged from long-held employment).

### IV. Advantage's Legitimate Reasons for Termination

Advantage articulated legitimate nondiscriminatory reasons for Miller's termination.  Specifically, Advantage states that Miller was terminated for "work performance deficits including lab and medication errors, problems responding to and checking emails, inappropriate interactions with clients, and failing to comply with [Profile] and billing procedures."  Def.'s Mem. Supp. Summ. J. 2, ECF No. 14-1; Pl.'s Dep. Ex. 13, Letter from Fred Eckhardt to Jane Miller (Aug. 13, 2009), ECF No. 26-13. Because these performance deficiencies might motivate a reasonable employer to terminate an employee, Miller must meet

the reasons head on and rebut them. *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)(en banc).  The precise issue for the Court to decide at this summary judgment stage is whether sufficient evidence exists from which a reasonable juror could conclude that these articulated reasons are pretext for discrimination. *Id.* at 1037.

## V.    **Pretext**

Miller may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Kragor,* 702 F.3d at 1308 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  As explained below, Miller demonstrates pretext both directly and indirectly, thus avoiding summary judgment.

### A.    Evidence of Age Animus

Although Eckhardt's age-related comments may not be "direct evidence" of discrimination, they certainly establish circumstances from which a jury could reasonably infer his discriminatory animus. *Damon*, 196 F.3d at 1362-63 (finding that a supervisor's remark that he preferred "aggressive, *young* men" was "highly suggestive circumstantial evidence" of discriminatory animus).  While one stray remark long before termination is insufficient to show pretext, *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228-29 (11th Cir. 2002),

16

Eckhardt allegedly made a number of age-related comments over the years preceding Miller's termination. *E.g.*, Pl.'s Dep. 216:3-7. Furthermore, Miller testified that Eckhardt made at least one comment at Jackson, the last place she worked. Pl.'s Dep. 212:4-213:3.

Additionally, Miller's contention that Eckhardt harbors an age animus is supported by Pat Gibby's similar experience with Eckhardt. Gibby Aff. I ¶ 3-4. Eckhardt's comments to Miller and his similar conduct toward Gibby standing alone arguably present sufficient circumstantial evidence for a jury to conclude that Miller's age was the cause of her termination. *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291-92 (11th Cir. 1998) (holding that discriminatory comments made long before termination, considered with additional evidence of pretext, were sufficient for a jury finding of discrimination). But Miller does not rely solely on this circumstantial evidence in opposing Advantage's motion for summary judgment.

B. Miller Discredits Advantage's Productivity Reasons

Miller's evidence also demonstrates weaknesses in Advantage's productivity reasons that could cause a reasonable juror to find them unworthy of belief. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)("[T]he district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, or contradictions

in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.'" (quoting *Sheridan v. E.I. Dupont De Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)(en banc))). Although Advantage offers business records regarding Miller's alleged substandard productivity, Miller rebuts or explains all of these records. *See Wilson,* 376 F.3d at 1088 (noting a plaintiff must meet the defendant's reasons head on and rebut them).

First, Miller contends that Advantage's emails regarding paperwork backlog while she was at Clarke relate to the backlog left by her predecessor. Pl.'s Decl. ¶ 5. Miller explains that she was not personally behind. Pl.'s Dep. 171:4-9. A reasonable juror could believe Miller's explanation of the emails and conclude that her performance at Clarke was not substandard.

Second, Miller offers reasons to discredit Eckhardt's testimony that she was evaluated as an underperformer while she was at Clarke and Elberton. Besides directly disputing that she was behind on paperwork beginning in 2008, Miller testified that she received bonuses for productivity approximately every three months until Eckhardt transferred her to Jackson. *Id*. at 191:6-8. Miller also pointed to documents showing that she received productivity incentive pay at the beginning of her Jackson

tenure in February and May of 2009. Pl.'s Resp., Ex. 14, Personnel Action Requests, ECF No. 17-16.

Additionally, Miller's evidence creates genuine factual disputes regarding whether Miller was intentionally placed at Jackson to fail. She has presented evidence that she was given additional responsibilities without enough support to complete all of her paperwork and maintain a full patient caseload. She contends that this was done to ensure that she would not be able to complete all of her purported duties and to create a record for her termination. Miller offers an email to Eckhardt informing him that Miller's predecessor at Jackson had 436 Profiles past due or due that month before Miller started there. Shannon Sallee Email, ECF No. 17-8. Thus, Eckhardt knew there were paperwork problems at Jackson that were not Miller's fault. Miller also points to an email between Bromley and Eckhardt in which Bromley documented a complaint about Miller, and Eckhardt responded "Thanks, Robin; this helps." "This Helps" Email, ECF No. 17-20.

Miller also presents evidence that Eckhardt required her to treat nonemergency walk-ins while other nurses were not required to do so. Pl.'s Decl. ¶ 8; Meeks Decl. II ¶ 4. A jury could find that this was part of Eckhardt's plan to make Miller fail and to create a paper trail supporting her termination for productivity reasons.

19

Based on the totality of the evidence, a jury could reasonably conclude that Miller's alleged productivity problems were fabricated by Advantage and, therefore, a pretext for discrimination. *See Damon*, 196 F.3d at 1364 (holding that the totality of the evidence precluded summary judgment).

C.   Lab and Medication Errors, Refusal to Check Her Email, and Personal Complaints to Clients

Finally, Advantage contends that Miller was terminated partially for lab and medication errors, refusing to check her email, and making personal complaints to clients. Miller, however, specifically denies these allegations. Pl.'s Dep. 291: 22-293:12; 302:23-308:15. She asserts that the allegations are false and part of the plan to justify her eventual termination. *Id.* Again, when the totality of the evidence is considered, it is clear that factual disputes exist as to whether Advantage's stated reasons for terminating Miller were a pretext for age discrimination. *Damon*, 196 F.3d at 1361-62 (finding that the plaintiff's assertion that "poor performance" reprimands were fabricated to justify his termination was sufficient to survive summary judgment where the supervisors made age-related comments and other employees who made the same alleged mistakes were not terminated).

**CONCLUSION**

Miller has pointed to sufficient evidence from which a reasonable juror could conclude that Eckhardt harbored an age animus against her.   A reasonable juror could also conclude that, because of this age animus, Eckhardt transferred Miller to Jackson and placed her in a position where she would be guaranteed to fail.   Thus, a reasonable juror could find that Advantage's performance-related reasons are pretextual and that age discrimination is the more likely reason for Miller's termination.   The Court therefore denies Advantage's motion for summary judgment (ECF No. 14).


IT IS SO ORDERED, this 18th day of September, 2015.

S/Clay D. Land
_____
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA